# EXHIBIT 2

# Freezing Out Justice

How immigration arrests at courthouses are undermining the justice system



ACLU

# Freezing Out Justice

## How immigration arrests at courthouses are undermining the justice system

© 2018 AMERICAN CIVIL LIBERTIES UNION



Cover photo: icedmocha/Shutterstock

Since President Trump took office last year, immigration enforcement officers from Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) have dramatically expanded their presence at criminal and civil courts, including in family, landlord-tenant, and traffic courts across the United States. The presence of these officers and increased immigration arrests have created deep insecurity and fear among immigrant communities, stopping many from coming to court or even calling police in the first place. The impact of immigration enforcement at courthouses greatly undermines the security of vulnerable communities and the fundamental right to equal protection under the law, shared by noncitizens and citizens. These actions have sown confusion and spread fear and mistrust — limiting the efficacy of the judiciary, law enforcement, survivors' services, public defenders, and other core services available at courthouses.

A new and extensive survey conducted by the National Immigrant Women's Advocacy Project (NIWAP) in partnership with the ACLU shows that the fear of deportation — magnified by immigration arrests in courthouses since President Trump took office — is stopping immigrants from reporting crimes and participating in court proceedings. The NIWAP survey compares 2017 data with 2016 data on crime survivor participation in investigations and court proceedings. It is based on responses from 232 law enforcement officers in 24 states; 103 judges, three court staff and two court administrators in 25 states; 50 prosecutors in 19 states; and 389 survivor advocates and legal service providers spread across 50 states.

What is clear from the results is that when immigration officers conduct arrests in courthouses, there can be significant damage to the ability of the police, prosecutors, defenders, and judges to deliver justice. This is true even in places where local law enforcement and court officers are supportive of immigrants' right to access the justice system and have invested in efforts to build trust and relationships with the immigrant community. These results show that federal immigration enforcement undermines local policies designed by officials who know their communities best.

## The Impact of Fear on Public Safety

In 2017, immigration arrests by ICE soared by 30 percent from the 2016 fiscal year. During the same period, police officers reported the most dramatic drop in outreach from and cooperation with immigrant and limited English proficiency (LEP) communities over the past year. Since police are often the first point of contact for survivors of crime within the justice system, the decline in trust and cooperation has a significant impact on their work and on the rest of the justice system. Sixty-four percent of police officials surveyed cited a concern for community safety when immigrant crime survivors are afraid to seek assistance.

Approximately 22 percent of police officers surveyed reported that immigrants were less likely in 2017 than in 2016 to be willing to make police reports; 21 percent said immigrant crime survivors were less likely to help in investigations when police arrived at the scene of a crime; 20 percent reported that they were less likely to help in post-crime scene investigations; and 18 percent said immigrant crime survivors were less willing to work with prosecutors. As a result, law enforcement officials reported that many crimes have become more difficult to investigate: 69 percent said domestic violence was harder to investigate, 64 percent said this applied to human trafficking, and 59 percent said this was true about sexual assault.

Seventy-one percent of surveyed law enforcement officers also reported that the lack of trust and cooperation from immigrant crime survivors and those with limited English proficiency has already had an adverse impact on officers. Sixty-seven percent reported an impact on their ability to protect crime survivors generally and 64 percent reported an adverse impact on officer safety.

Fifty-four percent of judges participating in this survey reported court cases were interrupted due to an immigrant crime survivor's fear of coming to court, representing a significant disruption in the justice system compared with 43 percent of judges reporting this effect in 2016.

Prosecutors surveyed stated that in prior years, as cooperation between prosecutors and immigrant communities increased, survivors of crime were increasingly willing to come forward and assist law enforcement in prosecuting cases. However, over the past year, many categories of crimes have become more difficult to prosecute as a result of an increase in fear of immigration consequences. In particular, 82 percent of prosecutors reported that since President Trump took office, domestic violence is now underreported and harder to investigate and/or prosecute. Seventy percent of prosecutors reported the same for sexual assault, while 55 percent stated the same difficulties for human trafficking and 48 percent for child abuse. Even prosecutors in offices that offer assistance to crime survivors by providing necessary certifications for immigration visas said that crimes were being underreported by immigrant survivors of crime.

This survey also received information from legal services attorneys and victims' advocates who represent immigrant survivors of domestic violence, sexual assault, child abuse, human trafficking, and other criminal matters. The advocates surveyed worked for agencies that regularly represent immigrant crime survivors and help them to pursue related immigration relief. Survey respondents had served a total of 75,979 such individuals between January 2016 and October 2017.

Advocates and legal service providers reported that in 2017 the number of cases their offices filed for immigrant crime survivors decreased 40 percent from 2016. Instead, clients were staying in abusive, even dangerous situations, afraid to go to court and pursue claims that would provide them and their children with protection. Many reported that their clients stayed with or returned to abusers; 72 percent of advocates reported that their clients suffered daily, weekly or monthly abuse from their partner.

Eighty-seven percent of advocates surveyed stated they worked with law enforcement officers on community policing measures and providing outreach, services and support for crime survivors. And yet, despite these partnerships with local law enforcement, the recent upswing in immigration enforcement has had a severe adverse impact on the advocates' ability to help the clients pursue claims and protection in court.

The arrests of immigrants at courthouses in 2017 have had a far-reaching chilling effect. In interviews conducted by the ACLU, prosecutors and judges around the United States in the fall of 2017, these officials indicated that courthouse arrests that occurred far away, in other states, were well-known to their local immigrant communities and impacted immigrants' decisions to call for help or appear in court. This effect has consequences not only for immigrants but for the safety of entire communities.

## Closing the Courthouse Doors

Under the Trump administration, the presence of immigration officers in and near courthouses has dramatically increased. A survey by the Immigrant Defense Project (IDP) found that courthouse arrests by ICE have increased by a staggering 1200 percent in New York in 2017, eroding confidence in the justice system for immigrants and non-immigrants. Andrew Wachtenheim of IDP says, "Every day we hear about the most vulnerable people in our communities — survivors of violence, people who are mentally ill, young people, those who are LGBT, people racially profiled and arrested — terrified of going to court."

Immigration arrests at courthouses have risen not only in urban centers with large immigration populations like New York City or Los Angeles but also other parts of the country. The enforcement

2

actions are taking place in many kinds of civil and criminal courts, sweeping in people going to family court, for housing matters or traffic infractions, as witnesses, or to defend against criminal charges (including individuals who are acquitted or whose charges are dropped). In Burlington, Vermont, for example, ICE arrested a dairy worker who was married to a U.S. citizen and the father to two young children as he was arriving at the courthouse to appear on charges for a DUI; the DUI charges were dismissed. In a family court in Oakland County, Michigan, an undocumented father was arrested by Customs and Border Protection agents when he appeared at a hearing to request custody of his children, who he believed were in danger from his ex-wife's violent boyfriend.

In one notorious courthouse arrest in 2017, ICE agents arrested an undocumented woman at an El Paso County courthouse as she sought a protective order against her abusive boyfriend, who is believed to have tipped off immigration officials to the woman's upcoming court appearance. This and other high-profile courthouse arrests have spread fear nationwide to immigrants and their relatives who, according to police and prosecutors, are now terrified to come forward because of the possible immigration consequences for their own security and their family's safety.

The right to access courts is a fundamental right, and one that protects and ensures other core constitutional rights like due process and equal protection of the law. The Supreme Court has recognized that "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." But courts can't operate fairly or effectively when people don't feel safe coming forward. Recognizing the far-reaching impact of ICE arrests at courthouses, judges in states like California, New Jersey, and Washington have protested against courthouse enforcement, telling the Department of Homeland Security that courts and the justice system should not be used as "bait" and warning of the danger to public safety when crime survivors and witnesses are afraid to come forward. State judge Rosemary Collins in Illinois said that heightened immigration enforcement in the community could dissuade survivors of crime from coming to courthouses seeking protection orders against their abusers: "That's my concern, that people won't come to court to get orders of protection they are entitled to get because of fear they or their families will be put on ICE's radar. As a result, their safety and the safety of the community will suffer."

The Chief Justice of California, Tani G. Cantil-Sakauye, wrote to Attorney General Jeff Sessions and then-Secretary of Homeland Security John Kelly, "[E]nforcement policies that include stalking courthouses and arresting undocumented immigrants, the vast majority of whom pose no risk to public safety, are neither safe nor fair. They not only compromise our core value of fairness but they undermine the judiciary's ability to provide equal access to justice." In New Jersey, Chief Justice Stuart Rabner wrote to then-Secretary Kelly that "A true system of justice must have the public's confidence. When individuals fear that they will be arrested for a civil immigration violation if they set foot in a courthouse, serious consequences are likely to follow. . . .I believe in the rule of law. But I respectfully urge that we find a thoughtful path to further that aim in a way that does not compromise our system of justice."

Similarly, prosecutors around the country — including in California, Colorado, Massachusetts, and New York — have publicly condemned immigration enforcement actions in courthouses given the chilling effect on immigrants. These concerns are not speculative. According to Denver City Attorney Kristin Bronson, in the months following the release of a videotape of ICE waiting in a courthouse hallway to make an arrest in Denver, Colorado, 13 women decided not to pursue domestic violence cases against their abusers for fear of deportation.

In Michigan, Washtenaw County Sheriff Jerry Clayton, who also consults with the ACLU on policing policies, observes that the immigrant community has been an essential partner in addressing and improving public safety. "At the local level, in this profession, we know that our success in keeping communities safe is grounded in our relationship with the community — that there is respect

3

between police and the community as well as a clear understanding of what our role is, which is not to enforce federal immigration law," says Clayton. "This relationship means that people are more likely on the front end to report crimes and be an active participant throughout the whole justice process, from investigation through the court process." He says that what ICE is doing at courthouses "severely compromises us at the local and community level and undercuts our ability to provide public safety. Every time someone refuses to participate by reporting a crime, we run the risk of continuing the victimization of that individual and possibly of someone else."

Kristin Bronson from the Denver City Attorney's Office raised concerns that local police could be confused with ICE officers who are in plainclothes in the Denver courthouses every week. "People don't know how to identify them," she said, "And that is our concern too — when you can't identify them as ICE, you may confuse them with undercover police officers and we want to avoid any appearance that our local police are engaged in enforcing federal civil immigration laws."

Even without a local arrest or reported incident, law enforcement and community advocates observe that immigrant survivors of crime are afraid to approach police because of the risk that asking for help will lead to harmful consequences. Michael LaRiviere, the Victim Services Officer in the Criminal Investigations Division with the Salem Police Department in Massachusetts, notes that even without a major local incident, the fear in the community is palpable. "We have had to address reluctance and fear but we do it. A person's immigration status isn't an issue for us, and people need to know they can come to us without fear."

Because of these effects, there has been growing resistance to these courthouse arrests, with public defenders walking out of court in protest in New York; pastors organizing court-watching programs in New Jersey; and groups like the ACLU organizing vigils and suing for information in Oregon.

## Federal Policies on Immigration Arrests in Courthouses

Despite this outpouring of concern from police, prosecutors, judges, legal service providers, and affected communities, in October 2017, the Acting Director of ICE, Thomas Homan, reaffirmed that ICE will continue to arrest immigrants at courthouses. A new ICE directive on courthouse arrests, released in early 2018, provided some guidance to when immigration arrests were permitted, noting that ICE "should generally avoid enforcement actions" in and near non-criminal court proceedings and will not arrest witnesses or family members "absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions." At the same time, the directive authorizes courthouse arrests in civil and criminal courts and significant discretion and ambiguity in the hands of ICE. For one thing, in many jurisdictions and particularly in rural areas of the United States, civil and criminal court proceedings take place in the same building. Moreover, this directive leaves in place ICE's position that it can go after any person it believes is removable without categorically prohibiting those arrests in courthouses.

At the same time, some law enforcement groups support ICE actions at courthouses. The New York State Court Officers' union, for example, has told its officers to cooperate with federal immigration agents conducting courthouse arrests and instructed staff to "report any attempts by anyone to obstruct ICE to the union immediately." In Orange County, California, Delia (full name withheld), a young woman with DACA status (Deferred Action for Childhood Arrivals), was arrested at her home by immigration agents who claimed to be probation officers, a day after her routine probation check-in. Delia was on probation after destroying some clothes that belonged to her abusive former boyfriend. According to her attorneys, she had not violated the terms of her probation but it appears that the probation office provided her information to ICE, leading to her arrest and detention.

4

ICE's position has been that courthouse arrests are both permissible and justifiable because courts are a safe setting for immigration agents to conduct arrests. ICE also claims that conducting these courthouse arrests is necessary because some law enforcement agencies now refuse to carry out immigration holds ("detainers") on noncitizens with whom they come into contact. (An ICE detainer is a request from ICE to local or state law enforcement to detain a person for an additional 48 hours after their release date, without a judicial warrant and without an opportunity to contest detention and sometimes without any pending charges, allowing ICE to decide whether to take custody of the individual and to start deportation proceedings). In 2014, the Department of Homeland Security had actually directed ICE to limit its use of detainers, acknowledging "the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment."

### Turning Our Back on Immigrant Crime Survivors

Using the courts to go after survivors of abuse is an about-face in federal policy. Over the years, Congress has adopted several bipartisan measures to protect immigrant survivors of crime and to encourage them to report crimes to law enforcement. Those measures, including the Violence Against Women Act (VAWA) and the Trafficking Victims Protection Act (TVPRA), were passed to protect survivors of crime by removing abusers' ability to use the threat of deportation to silence those they victimized. VAWA, for example, permits spouses, children, and parents of U.S. citizens or lawful permanent residents to "self-petition" for lawful permanent residence rather than rely upon their abusers to request an immigration visa. VAWA also includes confidentiality provisions to prevent agencies — including the Department of Homeland Security — from relying on tips from abusers to locate and arrest noncitizen crime survivors.

The U and T visas were created for survivors of domestic violence, sexual assault, trafficking and other crimes who cooperate with law enforcement to identify and prosecute abusers. Immigrant crime survivors who are eligible for these visas need to have their applications "certified" by a designated official — often a police officer, prosecutor or a judge — to confirm their participation and assistance in bringing a case to justice. Special Immigrant Juvenile Status (SIJS) protections apply to immigrant children who have been abused, abandoned or neglected by one or both of their parents; as a prerequisite to applying, a child must obtain a finding from a court that their situation qualifies.

These programs have been a critical lifeline for immigrant survivors of crime and an important tool for law enforcement to ensure that survivors and witnesses can safely come forward and pursue cases without the looming danger of deportation. According to the NIWAP study, in 2017, whether immigrant crime survivors continued to go to court depended largely on the court's participation in programs to help immigrant crime survivors and witnesses. Courts that signed certifications for one or more of these cases reported an *increase* in requests for visa certifications (20 percent for U visas and 30 percent for SIJS) in 2017 compared to 2016. Thirty-five percent of judges surveyed in 2017 compared with 27 percent in 2016 reported that their cases were interrupted due to immigrants' fear of coming to court. Judges in courts that participate in programs to certify visas also reported hearing more cases in 2017 than in 2016 in which parties raised the immigration status of an opposing party, survivor or parent.

Leslye Orloff, director of NIWAP and the study's principal author, observes that the damage to police and community relations when courts are not seen as safe spaces can be devastating but is also predictable: "Eroding trust that law enforcement has built with immigrant crime survivors is particularly dangerous. Our prior research has found that when survivors find the courage to seek immigration relief, perpetrators of domestic violence and workplace-based sexual assault are actively involved in reporting survivors for deportation to ICE and CBP. Stepped up immigration enforcement, particularly at courthouses, aligns with perpetrators' threats that if survivors report

the abuse, seeking help from police or courts will result in the survivor being detained and deported and never seeing her children again."

Last July, members of the Democratic Senate Caucus wrote to then-Secretary John Kelly of the Department of Homeland Security expressing deep concern that courthouse enforcement undermined critical protections for immigrant survivors of crime like the Violence Against Women Act (VAWA) that have long had bipartisan support. VAWA is up for reauthorization in 2018, and at a recent hearing before the Senate Judiciary Committee, Katharine Sullivan from the Department of Justice's Office on Violence Against Women reaffirmed the importance of a "a real collaborative community response" where survivors know they can go to police and receive support.

But the future of federal protections for crime survivors is uncertain. In 2013, the last time Congress reauthorized VAWA, only 22 Senators opposed reauthorization — one of whom was Jeff Sessions. Sessions recently signaled that the Justice Department may erode protections for immigrant survivors of domestic violence and sexual assault. On March 7, he ordered the review of a court decision granting immigration relief to a Salvadoran woman who sought asylum after repeated physical and sexual abuse by her ex-husband. Not only did he order the case reexamined but referred it to himself for review, prompting widespread concern amongst advocates and immigration judges about the fairness and transparency of this review.

***

The battle over courthouses is only one site in the growing feud between federal immigration agents and many state and local officials. The Justice Department recent lawsuit against the State of California is one of the most public and aggressive actions taken against state officials for implementing pro-immigrant, sanctuary policies. Homeland Security Secretary Kirstjen Nielsen has also said that her department has asked the Justice Department to investigate whether criminal charges could be levied against local officials for carrying out sanctuary policies.

When the federal government insists on conducting immigration arrests in courthouses and taking away that central space for justice, it is harder for prosecutors, police, defenders, and judges to do their job. This tactic, by instilling fear and essentially excluding noncitizens and their relatives from the courts, threatens constitutional rights, like equal protection and due process, as well as the safety of the broader community.

## Recommendations on Immigration Enforcement in Courthouses

To the Department of Homeland Security:

- **Issue new department-wide guidance that adds courts to the list of sensitive locations that are protected from immigration enforcement actions.** Like schools, hospitals, and places of worship, courthouses should be safe places that are easily accessed by all people. The ACLU encourages DHS to modify the 2011 ICE sensitive locations memo and the 2013 CBP sensitive locations memo to explicitly state that courthouses are protected.

To Congress:

- **Pass the Protecting Sensitive Locations Act (S. 845/H.R. 1815).** The Protecting Sensitive Locations Act codifies the Department of Homeland Security's existing sensitive locations policies and expands on them to ensure that immigrants are able to access education, criminal justice, and social services without fear of deportation. The bill also prohibits CBP, along with ICE, from arresting, interviewing, searching, or surveilling anyone

6

for the purposes of immigration enforcement within 1,000 feet of a courthouse or other sensitive location.

- **Direct the DHS Office of the Inspector General (OIG) to conduct an investigation into ICE/CBP policies and actions at courthouses and other sensitive locations.** While this report provides a glimpse into ICE and CBP practices and the frequency of courthouse arrests, a lack of oversight and public reporting has left the public with a number of unanswered questions around DHS' sensitive location practices and procedures. An OIG investigation should seek to provide the public with concrete data on rationales for and results of enforcement actions at courthouses and other sensitive locations, as well as specific information regarding how DHS oversees such actions, including how they, along with ICE and CBP:

  - Request and approve enforcement actions at or near courts and sensitive locations;
  - Train employees regarding courthouse arrests and sensitive locations policies and procedures;
  - Keep records with regard to enforcement actions at or near courthouses and other sensitive locations;
  - Process complaints at ICE and CBP regarding enforcement actions at courthouses and other sensitive locations (data should include the number of complaints made against the agencies since January 20, 2017);
  - Implement disciplinary procedures with regard to agent actions at or near courthouses and other sensitive locations. Data should include the number of complaints since January 20, 2017 that have been acted upon by management at ICE and CBP, and the number and types of disciplinary actions taken.

- **Limit ICE and CBP funding for enforcement at courthouses and other sensitive locations.** The ACLU supports efforts to prohibit funding for ICE and CBP enforcement activity in and around courts and other sensitive locations. Such requirements would provide much needed oversight and hold immigration agencies accountable for actions that threaten the constitutional rights and safety of all those in the community.

- **Pass legislation to mandate data collection and public reporting on enforcement actions at courthouses and other sensitive locations.** Transparency and oversight are fundamental to ensuring that immigrants' rights are respected by all law enforcement agencies. Congress should require that ICE and CBP maintain detailed data on rationales for and results of enforcement actions, and provide regular public reports with data on enforcement actions at courthouses and other sensitive locations.

- **Pass legislation to require ICE and CBP to seek approval from a chief judicial officer before conducting immigration enforcement actions at or around courthouses.** Judicial officers have an administrative responsibility to ensure orderly and fair operation of their courtrooms without warrantless interference by federal immigration enforcement. Mandating their approval would respect federalism, recognize the vital role that unimpeded access to civil and criminal justice processes plays in our society, and provide another important check against harmful routine ICE and CBP presence at courthouses.

7

To State and Local Court Officials:

- **Issue guidance directing court personnel not to facilitate federal immigration enforcement activities in the course of their employment, unless required by a judicial order.** The guidance should clarify that court personnel are not required to disclose citizenship or immigration status information about any person, unless required by judicial order or state or federal law. The guidance should include a prohibition on providing any information to federal immigration officials other than citizenship or immigration status information, or taking any action not required in the regular course of a court personnel's duty to stop, question, interrogate or investigate an individual based solely on actual or suspected immigration or citizen status or a civil immigration warrant, administrative warrant, or an immigration detainer. It should be made clear that court personnel should not inquire about the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance, unless such inquiry is required for the performance of the court personnel's regular duties.

- **Educate judges, prosecutors, and police about their role in providing certifications for U visas and encourage them to do so in appropriate cases.** Congress specifically authorized judges to provide certifications to noncitizen victims of crime who have suffered substantial mental and physical abuse resulting from the criminal activity and are willing to cooperate with law enforcement in the detection, investigation or prosecution of that criminal activity. These certifications are required to qualify for U visas, which were created in federal law to encourage immigrant crime victims to report criminal activity. If judges in a court system carry out this role, they will send a message to crime victims that their courts recognize the important role they play in the criminal justice process.

8